5514.  GEORGIA, FLORIDA & ALABAMA RAILWAY COMPANY *v.* BLISH MILLING COMPANY.

1. An action of trover against a carrier, for conversion of goods received by the carrier for transportation, may be maintained in the county in which the conversion took place; and this is so without regard to whether the carrier received the goods in interstate transportation under a bill of lading issued to the plaintiff by a connecting carrier in another State.

2. (*a*) A shipper, by consigning goods to his own order and attaching to the bill of lading a draft for the price of the goods, indicates an unequivocal intention to retain title to them until his draft is paid.

(*b*) Any distinct act of dominion, inconsistent with the owner's right, wrongfully exercised over his property by another, may amount to a conversion, whether the wrong-doer exercised such dominion for his own use or for the use of a third person.

(*c*) Where goods shipped to the shipper's order are delivered by the carrier to another without production of the bill of lading covering the shipment, the delivery is at the carrier's risk and may subject the carrier to a suit in trover.

3. A carrier who, by conversion of property which the carrier received for transportation, abandons the contract of carriage, can not insist upon a stipulation in the bill of lading that claims for loss or damage must be made within a specified time and in writing, to the carrier's agent at the point of delivery. The carrier can not repudiate the contract and then hold the shipper to its terms.

4. "Demurrer, being a critic, must itself be free from imperfections." *Douglas, Augusta & Gulf Ry. Co.* v. *Swindle,* 2 *Ga. App.* 550 (4), 556 (59 S. E. 600), citing *Martin* v. *Bartow Iron Works,* 35 *Ga.* 323. Even if a demurrer alleging that the petition "does not show any right in the plaintiff named therein to bring the suit" was sufficiently specific

to present the objection that the petition failed to allege whether the plaintiff was a partnership or a corporation, this objection would not constitute a sufficient ground for demurrer; for the plaintiff's name, "Blish Milling Company," imports a corporation.

5. The court did not err in overruling the ground of the demurrer that "the suit being a suit in trover, and the petition not showing that the bailment is waived, and the property not being in the hands of, nor suit filed against, either party to the contract, the suit will not lie."

6. An assignment of error as to the refusal to allow counsel to propound a certain question to a witness, or the witness to answer it, presents nothing for the consideration of the reviewing court, when it does not appear that the trial judge was informed of the probable answer of the witness.

7. An instruction to the jury to the effect that where there are discrepancies in the testimony of different witnesses, it is the duty of the jury, if possible, to reconcile the discrepancies so as to make each witness speak the whole truth, but if they be unable to reconcile the discrepancies, it is within their province to say who and what they will believe, does not afford ground for a new trial.

8. A mere offer to deliver is not delivery; and an unaccepted offer to restore converted chattels will not relieve the tort-feasor nor ordinarily mitigate damages. Especially would the offer be ineffectual if made after deterioration in the character, quality, and value of the goods, and without an offer to make good the loss, by tendering such an amount as would place the owner in the position in which he would have been if there had been no conversion. A tender in trover must embrace all the property claimed by the plaintiff, and must be unconditional.

9. Since it appears, from the evidence, that the freight upon the shipment of flour had not been paid, the court erred in instructing the jury that if they were satisfied, from the evidence, that the defendant converted the flour, they would be authorized to find for the plaintiff the freight charges, in addition to the market value of the flour; and direction is therefore given that the verdict and judgment be reduced by writing off the amount of the freight charges as disclosed by the undisputed evidence.

10. The instructions to the jury as to mitigation of damages were not subject to the exceptions taken.

11. Where a plaintiff asks an alternative verdict in damages for the conversion of property, and it appears, without dispute, that the property itself can not be restored to him, it is a matter of no concern to him whether the property was damaged while in the possession of the defendant or not; for he is entitled to recover the market value of the property at the time of the conversion, with interest. Therefore it was error for the court to charge the jury that if they found that damage was done to the flour while in the possession of the defendant, after a conversion of it by the defendant, they would be authorized to find in favor of the plaintiff whatever amount the evidence might disclose that damage to be; but in view of what has been stated above in this headnote, and as is apparent from the amount of the verdict, the error was harmless to the defendant.

DECIDED SEPTEMBER 11, 1914.

Trover; from city court of Bainbridge—Judge Spooner. February 4, 1914.

On May 13, 1910, the Blish Milling Company, of Seymour, Indiana, shipped from that place to Bainbridge, Georgia, a car-load of flour, consigned to itself, with order to notify Draper-Garrett Grocery Company. The bill of lading, acknowledging receipt of the flour at Seymour, Indiana, was issued by the Baltimore & Ohio Southwestern Railway Company. The shipper's sight draft upon the Draper-Garrett Grocery Company, for $1,109.89, covering the price of the flour and the additional sum of $10 as a carrying charge of five cents per barrel for 200 barrels for one month, was attached to the bill of lading, with proper endorsement, and sent to a bank in Bainbridge for collection. The flour was loaded in car "A. G. S. # 8455," and from that car was transferred en route by the Central of Georgia Railway Company, at Atlanta, Georgia, and placed in car "K. C., F. S. & M. # 27286," in which it reached Bainbridge over the line of the Georgia, Florida & Alabama Railway Company, in accordance with routing; and the last-named railway company, without requiring payment of the draft and surrender of the bill of lading, delivered the car of flour to the Draper-Garrett Grocery Company, immediately on its arrival, June 2, 1910, by placing it on a side-track owned and controlled by the grocery company. The bill of lading and draft were not called for, and were finally returned to the Blish Milling Company. The grocery company, on delivery of the car, opened it and unloaded a part of its contents, but discovered that some of the flour was wet, and thereupon reloaded the part that had been unloaded, and turned the car back to the railway company. The railway company retook possession of the car and unloaded it, and in a few days sold, as perishable property, a part of the flour alleged to be damaged, and on December 23, 1910, sold the remainder. On June 3, 1910, after the grocery company had turned the flour back to the railway company, B. C. Prince, traffic manager of the Georgia, Florida & Alabama Railway Company, telegraphed to the Blish Milling Company as follows: "Flour order-notify Draper-Garrett Grocery Company refused account damage. Hold at your risk and expense. Advise disposition." On the next day the milling company replied by telegraphing to Prince, "Sending our representative there. What is nature of damage?" To this Prince replied: "Flour transferred

in route. Slight damage by water, apparently rough handling. When will your representative reach Bainbridge?" The Blish Milling Company replied that its man would be there that night or the next day. On June 7 (after the milling company's representative had reached Bainbridge and conferred with the agents of the railway company and with the grocery company) the milling company sent a final telegram, saying, "We will make claim against railroad for entire contents of car at invoice price. Must refuse shipment as we can not handle." It appears, from the evidence of Mr. Draper, that the price of flour declined after his order was given and before the flour reached Bainbridge. There is conflict in the evidence as to a tender of the flour by the railway company to the milling company's representative. According to some of the testimony, about 18 barrels of the flour had been sold by the railway company before the alleged tender was made, and therefore it was not within the power of the carrier to tender the shipment in its entirety. The contract of shipment contained a provision that "claims for loss, damage, or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after the delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made, the carrier shall not be liable." So far as appears from the record, no claim was filed by the shipper.

After the dismissal of a former suit, which it appears was filed on February 14, 1911, the Blish Milling Company filed the present suit in trover, alleging a conversion of the shipment by the carrier; and, the plaintiff having elected to take a money verdict for the value of the property, the jury rendered a verdict in its favor for $1,084.50. It was admitted by the parties that the freight was never paid; that the draft should have been for $1,099.89, and that the freight on the car from Seymour, Indiana, to Bainbridge, Georgia, amounted to $124.21. On the trial a demurrer to the petition was overruled. Exceptions pendente lite to this ruling, as well as exception to the judgment refusing a new trial, are brought up by the bill of exceptions.

T. S. Hawes, W. H. Krause, for plaintiff in error.

R. G. Hartsfield, Erle M. Donalson, contra.

RUSSELL, C. J. (After stating the foregoing facts.) The de-

murrer includes four grounds of objection to the petition, which we shall consider seriatim.

1. In the first ground complaint is made that the city court of Bainbridge "is without jurisdiction of the subject-matter of the case in question, the cause of action being a contract of bailment entered into by and between the Blish Milling Company and the Baltimore & Ohio Southwestern Railway Company." It is contended that the defendant was not directly connected with the contract, and that the action should have been brought against the initial carrier; or that if the present defendant was suable at all, the remedy against it was an action for damages, under the act of Congress of June 29, 1906, regulating interstate transportation, known as the Hepburn act. 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1284). Even though it be true that the shipment is controlled by the Hepburn act, we fail to see that the city court of Bainbridge is by that fact deprived of jurisdiction.

We think the ruling upon this ground of the demurrer is controlled by the decision of this court in *Southern Railway Co.* v. *Morrison,* 8 *Ga. App.* 647 (70 S. E. 91). In that case Morrison brought suit in trover against the railway company in Monroe county, to recover cotton alleged to have been delivered to it in that county, for shipment to Macon, in Bibb county, and by his own testimony was only able to show that he had delivered the cotton to an agent of the defendant in Monroe county, and at the time of the motion for nonsuit he had not shown that the cotton had not been shipped away from Monroe county, and therefore he failed to prove the venue; because he alleged an affirmative tort, and failed to show that the actual conversion did not take place in Bibb, or some other county. After Morrison had shown that the cotton was delivered to the carrier at a point in Monroe county, and not in Macon, thus, as stated by Judge Powell, "showing the loss, but not necessarily the conversion, the defendant came in and showed that the cotton had never been shipped out of Monroe county;" and this court held that an action of trover for conversion may be maintained against a carrier in the county where the conversion took place; and that "as the defendant's own testimony affirmatively disclosed that the presumed conversion took place at the point of shipment and not elsewhere, it consequently disclosed that if the plaintiff had a cause of action, he had one that lay within the venue where the suit was pending."

The fact that in the Hepburn act there is no reference to proceedings in trover suggests that Congress, not having dealt with the remedy provided by an action in trover, had left to each State the free use of that remedy at its option.　However, in the present case, if we look beyond its technical denomination, the scope and effect of the action is nothing more than that of an action for damages against the delivering carrier, suggested by learned counsel for the plaintiff in error as the plaintiff's appropriate remedy.　If an action for damages can be maintained against a delivering carrier, without the necessity of proving that the delivering carrier itself caused the damage (*Way* v. *Sou. Ry. Co.,* 132 *Ga.* 677, 64 S. E. 1066), and an action of trover can be maintained upon a constructive conversion evidenced only by the failure to deliver, it would seem clear, under the ruling in *Morrison's* case, supra, as well as under the ruling of the Supreme Court of the United States in North Penn. R. Co. *v.* Commercial National Bank, infra, that trover may be maintained against the last carrier when it is shown that the last carrier actually converted the property.　In such a case clearly the venue would be where the conversion occurred.

2.　In the second ground of the demurrer it is insisted that "the petition sets up no cause of action against the defendant."　The principles stated in the second headnote are well settled.　The bill of lading, according to the uncontradicted testimony, was not presented or demanded, and the draft had not been paid, at the time the defendant turned the car of flour over to the Draper-Garrett Grocery Company; and, under the terms of the contract, the carrier had agreed to deliver the shipment only to the Blish Milling Company, at Bainbridge, Georgia, or to its order, as might appear by the endorsement on the bill of lading.　"If for any reason the seller, at the time of the shipment and delivery of the goods to the common carrier, takes a bill of lading to his own order, and attaches thereto a draft for the purchase-money, he thereby expresses his intention to retain the title until the draft is paid, or accepted and secured; and where this method of shipment is adopted the carrier becomes the agent of the seller or consignor, and would be authorized to deliver the goods only on the surrender to it of the bill of lading."　*Southern Ry. Co.* v. *Strozier,* 10 *Ga. App.* 157 (73 S. E. 42.)　See also *Erwin* v. *Harris,* 87 *Ga.* 335 (13 S. E. 513), and *Moss* v. *Sell,* 8 *Ga. App.* 588 (70 S. E. 18).　On an "order notify"

shipment, where a draft upon the person to whom the goods were to be delivered upon payment of the draft was attached to the bill of lading, so endorsed as to give a bank control of the possession of the goods, the delivery of the goods to the drawee without requiring payment of the draft was held to be a conversion, subjecting the bank to an action of trover at the instance of the owner. *Hobbs* v. *Chicago Packing Co.,* 98 *Ga.* 576 (25 S. E. 584, 58 Am. St. R. 320). The milling company, by electing to retain title until payment of the draft, sold the goods for cash. The railway company, without any regard for the milling company's rights or wishes, and in violation of its expressed intention, undertook to let the Draper-Garrett Grocery Company have the flour on time, or without paying the draft; and, of course, this must be held to be a conversion. It is the wrongful exercise of dominion over another's property that makes a conversion. It is not necessary that the proof show that the defendant applied it to his own use; it need only be shown that he dealt with the property as if it were his own and in defiance of the owner's rights. It is entirely immaterial that the conversion was not for his own use or that he derived no benefit therefrom. *Merchants & Miners Transportation Co.* v. *Moore,* 124 *Ga.* 482 (52 S. E. 802). Whenever goods which the consignor has shipped to his own order are delivered without production of the bill of lading, the delivery is at the carrier's own risk, and subjects the carrier to liability in trover for the conversion. *Boatmen's Savings Bank* v. *W. & A. R. Co.,* 81 *Ga.* 221 (7 S. E. 125); Northern Penn. R. Co. *v.* Commercial National Bank, 123 U. S. 727 (8 Sup. Ct. 266, 31 L. ed. 287).

3. It is insisted, however, by counsel for plaintiff in error, that the milling company was precluded from bringing this action, by reason of the plaintiff's failure to comply with the stipulations in the third section of the bill of lading, which, in case of failure to make delivery, require the consignor to make a written claim for damages within four months. Counsel's whole argument is based on the fact that the shipment which is the subject-matter of this suit was moving in interstate commerce, under the provisions of the Federal law, and under a bill of lading regularly approved by the interstate-commerce commission. Counsel argue that as the Supreme Court of the United States has held that this provision of the contract is valid, and has held that the Carmack amendment to

the Hepburn act "furnishes the exclusive rule on the subject of the liability of a carrier under contracts for interstate shipments;" and that, as it has been further held by that court that the State laws declaring contracts invalid which require the bringing of an action against a carrier for loss or damage to a shipment in less than the statutory period are superseded, as to interstate shipments, by the Carmack amendment (M., K. & T. Ry. Co. *v.* Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. ed. 690), to hold that the plaintiff could maintain the present action would be to conflict with what has been held by the Supreme Court of the United States. Nothing could be more abhorrent to this court than a failure to yield cheerful adherence to the decisions of the Supreme Court of the United States. It is at once our duty and our pleasure to do so. This court has more than once referred to the fact that our commonwealth has incorporated in its organic law a declaration that the statutes of the United States and the decisions of the Supreme Court of the United States thereunder are paramount and controlling. We have examined with care the decisions to which counsel have referred, but we have failed to see how the original validity of the contract affects the issue before us. It is conceded that if there be any State law declaring invalid that portion of the contract of shipment which requires the bringing of an action within less than the statutory period, it is superseded by the Carmack amendment; and in M., K. & T. Ry. Co. *v.* Harriman, supra, it was held that it would not be unreasonable to limit the time within which claims for failure to make delivery should be filed. Under the rulings of the Supreme Court of the United States, and, even if the point had not been passed upon by it, under the provisions of our own constitution (since the passage of the Carmack amendment), we would hold that the stipulation to which counsel refer is perfectly valid. But, according to the allegations of the petition, the contract was abandoned and repudiated by the defendant; and the defendant could not thereafter insist upon the stipulation in the bill of lading as to the time within which claims for damage should be presented. *Merchants & Miners Transportation Co.* v. *Moore,* 124 *Ga.* 482 (52 S. E. 802).

No question of penalty or punishment of the defendant company, for failing to comply with its contract, is involved in the allegations of the petition as we view them. The suit was brought not because

of the failure to deliver, but because the defendant did deliver the goods, and because, by the wrongful delivery, in defiance of the consignor's instructions, the carrier appropriated the goods to its own use. The stipulation as to presentation of claim provided that *"in case of failure to make delivery"* the shipper should make his claim for damages within four months after a reasonable time for delivery; and this could not be held to include a case where there was not only failure to deliver to the consignee, but actual delivery to another.

Counsel criticizes the statement made in *Atlantic Coast Line R. Co.* v. *Goodwin,* 1 *Ga. App.* 356 (57 S. E. 1070), that "there is a wide difference between loss and conversion," and argues as if there is necessarily a conversion whenever there is a failure to deliver, and from that argues that the use of the words "in case of failure to make delivery," in the stipulation in question, precludes the present action. The statement made in the *Goodwin* case, supra, is adhered to, for a failure to deliver may entail loss upon a shipper without any conversion on the part of the carrier. In *Southern Ry. Co.* v. *Morrison,* supra, Judge Powell points out the difference between a mere failure to deliver and an actual conversion where there has been a failure to deliver (and, of course, a failure to deliver is included in and essential to the act of conversion). It is there said: "A person who has delivered goods to a carrier for shipment, . . where the goods have not been delivered at destination, . . can sue ex contractu in the county where the contract of shipment is made, or in the county where the contract is to be performed, that is, the county of the destination of the shipment. He can sue ex delicto for the carrier's failure to discharge its public duty of delivering goods at the place of destination. . . If he can show an affirmative tort, can show that the goods were in fact wrongfully converted by the carrier . . , he may sue in the county where the wrong took place, making the particular wrong itself, and not the breach of public duty for failure to deliver, the basis of his cause of action." Suppose the shipment were destroyed by fire, the shipper would lose the goods and the carrier would fail to deliver, and yet there would be no conversion. Instances might be multiplied indefinitely to show that while the failure to deliver may sometimes amount to a conversion, it does not necessarily have that effect. It has been held

that where a shipper sought to maintain trover for goods which the carrier refused to deliver without payment of freight, there was no conversion and the action would not lie. Under the rulings we have cited, there was in this case an actual conversion by delivery, which terminated the shipment. If the railway company's abandonment or repudiation of the contract did not terminate or annul it, it must be because there is some difference between a contract of carriage and other contracts which we are unable to see. It is true the conversion was technical, but it was a breach of the contract; and it is fundamental that if one party breaches the contract the other party is released.

It is not necessary to refer to the argument that the railway company waived its right to insist upon the provision of the bill of lading in regard to the filing of a written claim within four months; for the interstate-commerce commission, in Order No. 787, issued June 27, 1908, specifically ruled that no provision of a bill of lading can be waived. The question of a waiver is not involved here, because the allegation of the petition is that the carrier repudiated and violated the contract.

4. As to the third ground of demurrer, it is not necessary to add to what is said in the fourth headnote.

5. We think the fourth ground of the demurrer—that, "the suit being a suit in trover, and the petition not showing that the bailment is waived, and the property not being in the hands of, nor suit filed against, either party to the contract, the suit will not lie"—was properly overruled, since it appeared from the petition that the defendant was the last of several connecting carriers, each of whom had adopted the contract, and that the property passed into the possession of the defendant. The suit in trover was itself a waiver of the bailment. "A suit in trover is not an action for loss or damage to property, but an action for conversion of property. The conversion on the part of the carrier is an abandonment by it of its contract of shipment." *Merchants & Miners Transportation Co.* v. *Moore,* supra. In that case the bill of lading was issued, not by the defendant, the Merchants & Miners Transportation Company, but by the Baltimore & Ohio Railroad Company, and Moore & Company paid the draft and obtained the bill of lading at Savannah, the point of destination of the shipment. A stipulation similar to that in the instant case was incorporated in the

bill of lading in that case, and it was insisted there, as it is here, that the action could not be maintained, because there had been no written claim for loss or damage. As to this contention of the carrier, Cobb, J., in the opinion, says: "It can not repudiate this contract and then hold the shipper to its terms. Further, we do not think the terms of the contract cover such an eventuality. It was never contemplated by either party that a claim for damages should be presented to the carrier for the result of its voluntary act. It was the purpose of the contract to provide a procedure for the adjustment of damage suffered by reason of some occurrence for which the carrier was liable, but which it did not wrongfully bring about. There would be no reason in demanding that a claim be presented for damages flowing from an act which by its very commission denies any right in the claimant." In comparing that case with the case at bar it may be remarked that the only conversion shown there was the delivery by the defendant of the oats in question to another carrier, who transported them to Jacksonville.

6. Error is assigned upon the refusal of the court to allow a witness for the plaintiff to state, on cross-examination, the amount for which the flour was sold by the railway company in December. The movant insists that if the witness had answered in the affirmative, that the contents of the car sold for only $299, it would have demonstrated the value of the flour, and should at least have been considered by the jury on the subject of value. It is well settled that an assignment of error as to the refusal to allow a witness to be asked a question presents nothing for the consideration of the reviewing court, when it does not appear that the judge was informed of the probable answer of the witness. In the assignment of error before us it is stated that the defendant "did not and could not state that he expected any particular answer from this witness, the witness being from the enemy's camp and under cross-examination." There appear to be reasons why the rule requiring that the expected answer be stated to the court should be relaxed upon cross-examination, but the ruling of the judge seems to be in accordance with what has been previously held on this point. See *Loeb* v. *State,* 6 *Ga. App.* 28 (24 S. E. 338).

Aside from this, however, it does not appear that the plaintiff in error was injured by the refusal of the court to allow the witness to answer the question, because even if the witness had answered that

the flour was sold for $299 on December 23, 1910, that fact would have shed no light upon the value as legally computed in suits in trover. In trover the plaintiff is entitled to recover the highest market value between the date of the conversion and the time of the trial. The fact that at some time in the intervening period the value of the flour was very low did not touch the issue as to what was the highest market value between the date of the conversion and the time of the trial.

7. Exception is taken because the court charged the jury as follows: "Should any apparent discrepancies arise between the witnesses on the stand, it is the duty of the jury to reconcile such discrepancies, if possible, so as to make each and every witness speak the whole truth. Should you be unable to reconcile such apparent discrepancies, then it is entirely within the province of the jury to say who and what they will believe." It is insisted that the tendency of this instruction was to "turn the jury loose" to base the verdict on matters outside of the testimony, or at least to leave the jury to infer that they could arbitrarily disregard the whole evidence of a witness simply because there was a discrepancy at some point in his evidence. The verdict returned, which is supported by the evidence, does not indicate that the finding of the jury was based upon anything outside of the record; and so, while it would have been better for the judge to confine the jury to the testimony actually adduced, when he told them it was within their province to determine what they would believe, the movant failed to carry the burden of establishing injury as well as error.

8. Exceptions are taken to the charge of the court on the subject of tender. It is true that either actual return of the property or a tender to return goes in mitigation of damages, but the jury were authorized to find, from some of the evidence, that the entire property was never tendered, and for that reason, as well as because the court did expressly instruct them that evidence of tender would go in mitigation of damages, if they should find any, we deem a discussion of this assignment of error unnecessary. According to the plaintiff's evidence, 18 barrels of the flour had been sold prior to any offer to return the remainder. Under the undisputed testimony there had been a deterioration in the condition and value of the flour subsequently to the shipment; and in offering to return the flour to the Blish Milling Company the railway company did

not offer to make good the damage to the flour. This would have been essential to a good tender, even if the testimony to the effect that none of the flour had been sold at the time of the tender is in fact the truth of the case.

9. Since, under the well-settled rule in Georgia, the alternative recovery of damages in trover is limited to the value of the property converted, with interest, the court erred in instructing the jury that the freight charges were to be added thereto; but since the amount of the freight charges was fixed by agreement of the parties, it is unnecessary to send the case back for another trial to correct the error in this respect. It is undisputed that the freight had not been paid; and direction is therefore given that the verdict and judgment be reduced by writing off $124.21, the amount of the freight charges, together with $28.73, interest thereon.

10. Complaint is made that the court erred in charging the jury, "Should you find, from the evidence, that . . the railroad company converted the flour, but after so doing they made a tender of the entire shipment of flour back to the plaintiff, and that there had been no damage resulting, from the time of the alleged conversion to the time of the tender back to the plaintiff, this could be plead in mitigation of damages. Should you find that no damage had been caused by reason of the conversion, up to the time of the offer to tender, and of actual tender of the flour back to the plaintiff, you would be authorized in finding in favor of the defendant railroad company." It is insisted that this charge is confusing and conflicting and fails to state correctly the law, because the court failed to explain to the jury what was meant by "mitigation of damages," and did not specifically state that the jury could take the tender into consideration or deduct any amount from the market value of the flour, in mitigation of damages, and did not give any rule to govern the jury in determining what was mitigation of damages. From these instructions the jury were obliged to understand that if they found that no damage had resulted to the plaintiff from the alleged conversion, and that the defendant tendered the property back, these facts should be considered by them in reduction of the damages. The word "mitigation" is a term in ordinary use, and may be assumed to have been understood by a jury of ordinary intelligence. If counsel for the defendant desired the court to give instructions such as they contend should have been given on this

subject, the instructions should have been requested. Immediately following the instruction just quoted, as to mitigation of damages, the court charged the jury that if they should find "that no damage had been caused by reason of the conversion, up to the time of the offer to tender, and of actual tender of the flour back to the plaintiff," they "would be authorized in finding in favor of the defendant railroad company." This instruction afforded the defendant no ground for complaint, as it apparently qualified the instruction immediately preceding, and authorized the jury, if they credited the testimony in favor of the defendant, to find for the defendant in spite of the uncontradicted proof of conversion.

11. In instructing the jury that they would be authorized to find for the plaintiff for damage done to the flour after the conversion, the court erred, for the reason that by conversion the liability of the defendant and the amount thereof became fixed. If the defendant converted the property, it became liable to respond, either by being compelled to return the property itself, with its reasonable hire, or if it was not possible to return the property, to pay the market value and interest; and it was a matter of no concern to the plaintiff what the defendant did to the property after converting it. It is, of course, always error to submit to the jury a theory which finds no support in the evidence; but this error does not afford ground for reversal when it is perfectly plain that the error was harmless, and that it could not, from the nature of things, have affected the result. In the present case, it is true, there is no evidence that the defendant damaged the property after conversion; and therefore, even if this instruction had been correct, it would have been inappropriate; but there is absolutely no dispute as to the conversion, and even if the evidence as to the market value of the flour had been more conflicting than it was, the instruction as to damages to the flour after conversion could have had no bearing upon the finding of the jury on the subject of value.

We have already referred to the matter of freight, and it is apparent that the verdict in favor of the plaintiff included the charge for freight, which had not been paid by the plaintiff. Necessarily the cost of transportation, or, in other words, the freight charge, enters into the market value of an article at any designated point to which such an article is ordinarily transported. When the

freight has been paid by the shipper he will recover it in an action of trover when he recovers the market value at the point of destination. Where, in computing the market value of an article at a given point, the valuation includes charges of transportation which have not been paid by the shipper, the necessary freight charges should, of course, be deducted when the action is against the carrier who is entitled to collect the freight charges.

*Judgment affirmed, with direction. Roan, J., absent.*

NOTE: A writ of error from the Supreme Court of the United States was granted in this case.